Lawrance A. Bohm (SBN: 208716)
Kelsey K. Ciarimboli (SBN: 302611)
Scott C. Zienty (SBN:324661)
**BOHM LAW GROUP, INC.**
4600 Northgate Boulevard, Suite 210
Sacramento, California 95834
Telephone: 866.920.1292
Facsimile:  916.927.2046

Attorneys for Plaintiff,
ABBAS BAHARI

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABBAS BAHARI, | Case No.: |
| Plaintiff, | **PLAINTIFF'S VERIFIED COMPLAINT FOR DAMAGES:** |
| v. | |
| COUNTY OF SAN JOAQUIN; and DOES 1 through 50, inclusive, | 1) **Labor Code section, 1102.5;** <br> 2) **Labor Code sections, 6310 and 6311;** <br> 3) **Violation of Health and Safety Code, section 1278.5;** |
| Defendants. | 4) **False Promise, Civil Code, sections 1709 and 1710;** <br> 5) **Breach of Contract;** <br> 6) **Breach of Implied Covenant of Good Faith and Fair Dealing;** <br> 7) **Fraud/Intentional Misrepresentation; and** <br> 8) **Negligent Misrepresentation.** |
| | **AND DEMAND FOR JURY TRIAL** |

Plaintiff Abbas Bahari respectfully submits this Verified Complaint for Damages and Demand for Jury Trial and alleges as follows:

## OVERVIEW OF THE CASE

San Joaquin Hospital cares more about turning a profit than faithfully serving the people of San Joaquin County. Dr. Abbas Bahari observed horrifying patient safety standards, caused by a rogue neurosurgeon who rushed through medically unwarranted procedures, and an overzealous

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

1

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**      Lawrance A. Bohm, Esq.
*Bahari v. County of San Joaquin, et al.*      Kelsey K. Ciarimboli, Esq.
Case No.:      Scott C. Zienty, Esq.

Trauma Team that hoarded patients it knew it could not safely treat. Day after day, San Joaquin Hospital pressured Dr. Bahari to render treatment without proper documentation and perform surgeries that required higher levels of care than they could provide. Dr. Bahari championed the safety of his patients and the quality of care they received, and raised his concerns with the Chief of Surgery and the Chief Medical Officer. When his supervisor learned of his whistleblowing, he threatened to take Dr. Bahari out of the hospital and beat him into submission. With the lives of his patients in danger, Dr. Bahari escalated his complaints to the hospital CEO, and was promptly stripped of his duties, and fired less than three weeks later.

## PARTIES AND JURISDICTION

1.     At all times relevant to this action, Plaintiff, Dr. Abbas Bahari ("Plaintiff" or "Dr. Bahari"), was an employee of Defendant. At all times relevant to this action and during the entirety of his employment, Plaintiff resided in San Joaquin County, California. Dr. Bahari is domiciled in, and a citizen of, the state of Ohio.

2.     Defendant County of San Joaquin ("San Joaquin Hospital" or "Defendant") was, at all times relevant to this action, a public entity located at 500 West Hospital Road, French Camp, California 95231. Defendant was at all relevant times Plaintiff's employer, prospective employer, or former employer. Defendant is a citizen of the state of California.

3.     Venue and jurisdiction are proper in the United States District Court for the Eastern District of California because the majority of the events giving rise to this action took place in San Joaquin County; Defendant was at all times mentioned herein, operating and doing business in San Joaquin County; Plaintiff worked for Defendant in San Joaquin County; the damages sought exceed the jurisdictional minimum of this Court; and because the majority of witnesses and events occurred in San Joaquin County.

4.     Plaintiff is domiciled in, and a citizen of, the state of Ohio. Defendant is a citizen of the state of California. The amount in controversy exceeds $75,000.00, not counting interest and court costs. As such, this Court has diversity jurisdiction over all claims in this matter under title 28 United States Code section 1332.

///

Bohm Law Group, Inc.
4600 Northgate Boulevard, Suite 210
Sacramento, California 95834

2

Plaintiff's Verified Complaint for Damages and Demand for Jury Trial
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

5.      Plaintiff is ignorant of the true names and capacities of the Defendants sued herein as DOES 1 through 50. Defendants DOES 1 through 50 is sued herein under fictitious names pursuant to California Code of Civil Procedure section 474. Plaintiff is informed and believes, and on that basis alleges, that each Defendant sued under such fictitious names is in some manner responsible for the wrongs and damages as alleged herein. Plaintiff does not at this time know the true names or capacities of said Defendants, but prays that the same may be inserted herein when ascertained.

6.      At all times relevant, each and every Defendant was an agent and/or employee of each and every other Defendant. In doing the things alleged in the causes of action stated herein, each and every Defendant was acting within the course and scope of this agency or employment, and was acting with the consent, permission, and authorization of each remaining Defendant. All actions of each Defendant as alleged herein were ratified and approved by every other Defendant or their officers or managing agents.

## STATEMENT OF FACTS

7.      In or around 1994, Dr. Bahari graduated from the University of Belgrade Faculty of Medicine. Over the course of the next twenty years, Dr. Bahari participated in some of the most highly regarded medical programs in the United States, including a general surgery internship at Morehouse School of Medicine, a pre-clinical neurosurgery fellowship at the University of Washington, neurosurgery residency at Henry Ford Hospital in Detroit, Michigan, and a Complex Spine Subspecialty fellowship at the University of Virginia.

8.      In or around 2014, Dr. Bahari took a job with Chaparral Medical Group, in Pomona, California, where he worked for approximately two years as a neurosurgeon.

9.      In or around April 2016, Dr. Bahari interviewed with Dr. Moris Senegor ("Dr. Senegor") to work as a neurosurgeon in Dr. Senegor's private clinic in Stockton, California. Dr. Bahari conducted preliminary research on the clinic and Dr. Senegor, and found many negative reviews from patients dissatisfied with Dr. Senegor's quality of medical care and services. Dr. Senegor had a reputation for receiving many patient complaints and malpractice lawsuits. Dr. Bahari declined an offer to join the clinic for fear of being associated with Dr. Senegor's

Bohm Law Group, Inc.
4600 Northgate Boulevard, Suite 210
Sacramento, California 95834

Plaintiff's Verified Complaint for Damages and Demand for Jury Trial
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

reputation.

10.     In or around late spring 2016, Dr. Bahari contacted San Joaquin Hospital in Stockton, California, to inquire about employment opportunities. San Joaquin Hospital needed a full-time neurosurgeon and granted Dr. Bahari an interview.

11.     In or around July 2016, Dr. Bahari interviewed with San Joaquin Hospital. During the interview, San Joaquin Hospital informed Dr. Bahari they would soon be opening a trauma center and asked if Dr. Bahari would be interested in the position of Chief of Neurosurgery. Dr. Bahari declined because he preferred to spend the maximum amount of time possible providing patient care, rather than being occupied with administrative responsibilities. As such, San Joaquin Hospital offered Dr. Bahari a general neurosurgeon position, where he would spend the bulk of his time providing neurosurgical clinical care, providing neurosurgical services to the trauma center, participating in the call schedule for neurosurgical emergencies, and supervising residents, interns, and allied health professionals.

12.     From in or around August 2016 through October 2016, Dr. Bahari and San Joaquin Hospital communicated back and forth, negotiating the terms of Dr. Bahari's employment contract.

13.     On or about October 31, 2016, Dr. Bahari began work at San Joaquin Hospital as a neurosurgeon. Dr. Bahari's employment contract established, among other things, that he would divide his time between neurosurgical clinical care and the call schedule for neurosurgical emergencies. It also outlined the Neurosurgery Performance Incentive Plan, which entitled neurosurgeons to "15% of their professional fee charges." Dr. Bahari's employment contract provided for "an additional $20,000 per year… for board certification in neurosurgery once you receive it." The contract did not set any deadline by which Dr. Bahari was expected to receive board certification. Additionally, Dr. Bahari's employment contract provided him with "full malpractice coverage" for surgeries completed on behalf of San Joaquin Hospital. Dr. Bahari's position as neurosurgeon was to be under the direction of the Chair of Surgery, the Trauma Medical Director, and the Chief Medical Officer.

///

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

4

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

14.     In or around November 2016, Dr. Senegor invited Dr. Bahari to observe him perform a spinal fusion operation in San Joaquin Hospital, where Dr. Senegor had privileges for occasional work as a contracting neurosurgeon. Dr. Bahari agreed, but what he saw alarmed him. The surgery involved a routine procedure to address degenerative disc disease. Dr. Senegor, wielding an electric hand drill, entered through the front of the patient's neck to access the spine. However, Dr. Senegor was aggressive and sloppy with the drill, and attempted to show off to Dr. Bahari by completing the operation as quickly as possible. In the process, Dr. Senegor risked puncturing or shredding vital organs adjacent to the surgery site, including the patient's food pipe, wind pipe, and carotid arteries. Dr. Bahari had never before seen such careless behavior in his twenty-plus years in medicine.

15.     In or around December 2016, Dr. Senegor invited Dr. Bahari to dinner. During dinner, Dr. Senegor informed Dr. Bahari that he was joining San Joaquin Hospital as Chief of Neurosurgery. Dr. Senegor admitted to Dr. Bahari he had no other option, because he could no longer afford the costs from the constant stream of malpractice lawsuits brought against him by former patients.

16.     On or about January 5, 2017, Dr. Senegor began his employment at San Joaquin Hospital as Chief of Neurosurgery.

17.     On or about January 5, 2017, Dr. Bahari admitted a patient into the Intensive Care Unit ("ICU") with a serious brain bleed. Dr. Senegor confronted Dr. Bahari, urging him to relocate the brain-bleed patient to a regular floor in the hospital for "resource utilization purposes." This meant it would cost the hospital less to place the patient in a lower level of care, but there would be less rigorous monitoring of the patient's condition. Dr. Bahari refused, stating that any care below ICU-level was insufficient to prevent a sudden catastrophic decline in the patient's condition. Dr. Senegor responded, "Well things are going to have to change." When Dr. Bahari insisted that he would not compromise patient care, Dr. Senegor said, "We'll see about that." That same day, Dr. Senegor also reprimanded Dr. Azeem Oladunjoye ("Dr. Oladunjoye"), another neurosurgeon, for not completing an operation quickly enough. The duration of Dr. Oladunjoye's operation was entirely reasonable.

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

18.     Beginning in or around January 2017, after Dr. Bahari refused to compromise patient care, Dr. Senegor consistently assigned Dr. Bahari to the least desirable on-call shifts. Dr. Senegor crafted the on-call schedule so that Dr. Bahari tended to patients who suffered complications from surgeries hastily performed by Dr. Senegor ("surgical complication cases"). These complication cases naturally involved more complex and compounded medical issues for Dr. Bahari to handle, with more agitated patients and family members. All of this made Dr. Bahari's work extremely and unnecessarily taxing.

19.     Beginning in or around January 2017, Dr. Bahari received at least five surgical complication cases from Dr. Senegor per month. This number constituted between ten and twenty percent of all of Dr. Senegor's surgery patients. Each time Dr. Bahari received such patients, Dr. Bahari contacted Dr. Senegor to inform him of the complications, and request information and relevant documents. Specifically, Dr. Bahari requested patients' pre-operation ("pre-op") and post-operation ("post-op") MRI scans. Dr. Bahari needed this information to compare the before-and-after images to evaluate the surgery and determine the source of the complication. However, Dr. Senegor only took post-op scans, and either did not capture pre-op scans at all or did not make pre-op scans available to on-call neurosurgeons. Further, Dr. Senegor used CT scans for his post-op images in brain tumor removal cases, which are substantially less-detailed than MRI scans. Without pre-and post-op MRI scans in brain tumor removal cases, Dr. Bahari could not provide proper crossover and follow-up care to Dr. Senegor's patients. Further, Dr. Senegor kept patient information, documentation, and pre-op scans on a computer in an off-site clinic, thus making it unavailable to Dr. Bahari during crossover and follow-up care for surgical complication cases. When Dr. Bahari asked Dr. Senegor to supply those documents, information, and scans, Dr. Senegor refused. Dr. Senegor took these basic requests as Dr. Bahari questioning his competence and challenging his authority.

20.     During this time, Dr. Bahari noticed, during routine reviews of Dr. Senegor's surgical complication cases, that Dr. Senegor frequently took additional surgical measures that were not medically warranted. In one instance, Dr. Senegor carried out an extensive spinal fusion involving screws placed in multiple levels of a patient's spine. Looking at the post-op CT scans

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

for the procedure, both Dr. Bahari and Dr. Oladunjoye were baffled by the extent of the medical intervention and struggled to imagine any diagnosis to justify such a procedure. On information and belief, Dr. Bahari alleges Dr. Senegor carried out these medically unnecessary procedures in order to rack up additional surgical costs and ultimately his revenue.

21.     In or around late January 2017, Dr. Senegor threatened to proctor Dr. Bahari's work indefinitely. Limited proctorships are a typical feature of a surgeon's employment. Proctorships require a newly-hired surgeon have five to ten of their cases reviewed by another surgeon in the same field. The reviewing surgeon evaluates the newly-hired surgeon's work on a patient, running from pre-diagnosis through diagnosis and surgery, and all the way through post-op and follow-up care. Proctorships are intended to ensure new surgeons demonstrate competence and meet the employer's standards of skill and care before granting them full hospital privileges. Thus, indefinite proctorships deviated substantially from San Joaquin Hospital's standard practice of proctorship and threatened Dr. Bahari's hospital privileges, upon which his employment was conditioned in his employment contract. On information and belief, Dr. Bahari alleges Dr. Senegor's threat was aimed at preventing Dr. Bahari from attaining full hospital privileges at San Joaquin Hospital and undermining his employment contract.

22.     On or about January 26, 2017, Dr. Senegor scoured Dr. Bahari's operative notes and nit-picked his work. Dr. Senegor demanded Dr. Bahari justify the smallest, most basic, and obvious decisions, and micromanaged the style and organization of his notes. Dr. Bahari explained his decisions and corrected Dr. Senegor on medically incorrect statements and accusations. Dr. Senegor exploded in rage and threatened Dr. Bahari, shouting, "In my day, if I didn't follow instructions from senior neurosurgeons, they would take me out and beat me until I followed them!" Dr. Bahari said nothing, for fear that pushing back would cause Dr. Senegor to carry out his threat of physical violence. Dr. Oladunjoye and Dr. Bahari's medical assistant, Berta Medina, witnessed this exchange. Dr. Bahari reported this aggressive and physically threatening behavior to Dr. Sheela Kapre ("Dr. Kapre"), Chief Medical Officer of San Joaquin Hospital. Dr. Kapre said she would meet with Dr. Bahari soon to discuss the incident further. Such a meeting did not occur for another two months.

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

7

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**      Lawrance A. Bohm, Esq.
*Bahari v. County of San Joaquin, et al.*      Kelsey K. Ciarimboli, Esq.
Case No.:      Scott C. Zienty, Esq.

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

23.    In or around February 2017, Dr. Senegor sent Dr. Bahari threatening text messages, one of which referenced suffocation. Dr. Bahari showed these texts to critical care surgeon Dr. Shahin Foroutan ("Dr. Foroutan"), who recommended Dr. Bahari raise the issue with Dr. Kapre. Dr. Bahari emailed these text messages to Dr. Kapre, expressing concern for his personal safety. He received no reply.

24.    In or around late March 2017, Dr. Bahari continued receiving Dr. Senegor's surgical complication cases during on-call shifts. Per Dr. Kapre's request, Dr. Bahari compiled and provided a list of all the complications to Dr. Kapre. Dr. Bahari observed no indication that these complaints were investigated.

25.    Soon after, Dr. Bahari met with Dr. Kapre, Dr. Senegor, Dr. Oladunjoye, and Dr. Nathaniel Matolo ("Dr. Matolo"), San Joaquin Hospital's Chief of Surgery, to discuss the complaints about Dr. Senegor. During this meeting, Dr. Bahari complained that Dr. Senegor prioritized speed of surgeries above all else, including patient safety. Dr. Bahari also complained that he was expected to care for Dr. Senegor's surgical complication cases without adequate information, because Dr. Senegor either did not maintain or refused to make available proper documentation and pre-op scans, and performed unnecessarily extensive surgeries, thereby committing fraud. Dr. Bahari warned that Dr. Senegor's practices threatened to seriously harm San Joaquin Hospital patients, opened Dr. Bahari up to liability, and risked his own reputation. As such, Dr. Bahari informed Dr. Kapre, Dr. Matolo, and Dr. Senegor he would no longer provide care to Dr. Senegor's surgical complication cases without adequate documentation and information. Dr. Bahari also complained that Dr. Senegor was discriminating and retaliating against Dr. Bahari by threatening to proctor him indefinitely, depriving him of adequate patient documentation, assigning him to undesirable on-call shifts, nit-picking his work, and subjecting him to threatening and intimidating conduct. Dr. Bahari expressed fear for his personal safety because of Dr. Senegor's threatening and intimidating conduct, and asked Dr. Kapre that he not be required to meet with Dr. Senegor in person anymore. Dr. Kapre ignored that particular request, but instructed Dr. Bahari and Dr. Senegor not to interfere with each other's work. She also instructed the on-call schedule to be determined collaboratively between the three

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

1   neurosurgeons rather than by Dr. Senegor alone. Dr. Kapre also assured Dr. Bahari that his patient

2   safety complaints regarding Dr. Senegor would be investigated. Dr. Bahari observed no indication

3   that his complaints were investigated.

4         26.    Beginning in or around spring 2017, Dr. Senegor actively avoided proctoring Dr.

5   Bahari's cases, in an effort to prevent him from receiving full hospital privileges and to undermine

6   his employment contract.

7         27.    During the remainder of 2017, San Joaquin Hospital routinely deprived Dr. Bahari

8   of surgery patients and assignments. San Joaquin Hospital instead funneled surgery patients to

9   Dr. Senegor, thereby depriving Dr. Bahari of surgery incentive pay. Beyond the incentive pay,

10  Dr. Bahari needed to perform surgeries to maintain and develop his surgical skills, and to become

11  board-certified. San Joaquin Hospital also deprived Dr. Bahari of a full-time medical assistant

12  and additional clinic days, either of which would have allowed Dr. Bahari to accrue more surgery

13  patients. When Dr. Bahari did receive surgery patients, San Joaquin Hospital deprived him of

14  adequate surgical staff to provide support during operations, such as a physician's assistant, x-ray

15  technicians, and neuro-monitoring technicians. Inadequate staff caused Dr. Bahari's surgeries to

16  last substantially longer, putting Dr. Bahari's well-being at risk, as he faced increased fatigue,

17  exhaustion, and dehydration during surgeries ranging from eight to twelve hours long. The

18  inadequate surgical support also threatened patient safety. Dr. Bahari frequently raised concerns

19  about understaffing to Dr. Kapre and others. However, San Joaquin Hospital routinely

20  disregarded those concerns and continued its practice of understaffing Dr. Bahari's surgeries.

21        28.    On or about January 1, 2018, San Joaquin Hospital hired Dr. Ty to work as a

22  neurosurgeon. San Joaquin Hospital hired Dr. Ty to provide support to Dr. Senegor, because Dr.

23  Bahari and Dr. Oladunjoye both refused to render care to Dr. Senegor's surgical complication

24  patients without proper patient documentation.

25        29.    On or about January 5, 2018, Dr. Bahari complained to David Culberson

26  ("Culberson"), CEO of San Joaquin Hospital, and Dr. Kapre about having surgery patients taken

27  away without notice or approval. Culberson referred the issue back to Dr. Senegor, who took no

28  further steps to address the issue.

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

Bohm Law Group, Inc.
4600 Northgate Boulevard, Suite 210
Sacramento, California 95834

1    30.    In or around early 2018, Dr. Bahari entered into his office to find his business

2  cards removed from his business card holder and placed face down on his desk. In the business

3  card holder, he found a single business card of Dr. Senegor's, which had scribbled across it, "I

4  AM CHIEF OF NEUROSURGERY."

5    31.    In or around February 2018, Dr. Bahari refused to carry out an unsafe operation

6  on an overweight, multi-trauma patient. San Joaquin Hospital's Trauma Team received a patient

7  suffering from multiple traumas resulting from a serious car accident. The patient had a Body

8  Mass Index ("BMI") in excess of forty. However, San Joaquin Hospital maintained a policy or

9  practice of referring out surgery patients with a BMI of forty or above. Nevertheless, the Trauma

10  Team called Dr. Bahari to provide a consultation for the patient and perform neurological surgery

11  to stabilize the spine and resolve a brain bleed. Dr. Bahari advised the Trauma Team and Dr.

12  Frank Kennedy ("Dr. Kennedy"), Trauma Medical Director, that the patient needed to be

13  transferred. Dr. Bahari explained that because San Joaquin Hospital had inadequate surgical staff,

14  he could not safely perform a surgery on a patient of that size. Heavy patients are at higher risk

15  of complication because of their weight. Such patients also need at least one physician's assistant

16  to provide supplemental care, as well as X-ray technicians and neuro-monitoring technicians.

17  Beyond that, other additional staff are required to safely lift, turn, rotate, stabilize, or otherwise

18  manipulate the patient as needed during surgery. Too few staff attempting to move a heavy patient

19  posed clear risk to the patient, who could be accidentally dropped or maneuvered in an unnatural

20  and unsafe position. Even more, an understaffed operation also risked the health and safety of the

21  personnel who would be exerting themselves dangerously beyond their own physical capabilities

22  for extended periods of time. On this occasion, San Joaquin Hospital did not provide Dr. Bahari

23  with sufficient medical support staff to assist in this surgery. Additionally, the patient suffered

24  from other traumas simultaneously, making the prospective, understaffed operation more

25  dangerous for the patient. Dr. Bahari recommended the patient be transferred to a hospital with a

26  higher level of care. The Trauma Team insisted they keep the patient and requested Dr. Bahari to

27  perform the surgery. Dr. Bahari refused to perform a surgery that could cause more harm to an

28  already critical patient. Dr. Bahari also had a reasonable and good-faith belief that performing

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

1    such a surgery under the circumstances would violate state or federal law or regulation, including,

2    but not limited to, the Emergency Medical Treatment and Labor Act ("EMTALA"). The Trauma

3    Team decided to keep the patient, and had Dr. Oladunjoye perform the neurosurgery. As a result,

4    the patient suffered from a misplaced screw.

5         32.     On or about April 9, 2018, Dr. Kapre called Dr. Bahari into a meeting in her office.

6    Dr. Bahari arrived to find Dr. Kapre accompanied by Dr. Senegor, despite Dr. Bahari's prior

7    request not to have in-person meetings with Dr. Senegor. Dr. Senegor accused Dr. Bahari of

8    triggering a swollen neck in a surgical patient by carrying out too long of an operation. Dr. Bahari

9    denied the accusation, stating that the complication suffered by the patient had no medical ties to

10   the duration of the surgery. Dr. Bahari also contrasted this unavoidable complication to Dr.

11   Senegor's numerous avoidable complication cases. Dr. Senegor intended to personally investigate

12   the matter. Dr. Bahari questioned to Dr. Kapre whether Dr. Senegor could do so impartially;

13   however, Dr. Kapre was unphased by Dr. Bahari's concern.

14         33.     On or about April 10, 2018, Dr. Bahari called Dr. Matolo to notify him about Dr.

15   Senegor's retaliatory and baseless accusation against Dr. Bahari the day before. Dr. Matolo

16   replied, "I'll take a look at it. Thanks for letting me know."

17         34.     Days later, Dr. Bahari saw Dr. Matolo and again raised the issue of Dr. Senegor's

18   accusation against him. Dr. Matolo had not yet reviewed the false accusation, but conceded to Dr.

19   Bahari, "He wants you to leave on your own."

20         35.     On or about April 14, 2018, Dr. Bahari emailed Dr. Kapre to deny Dr. Senegor's

21   false accusation and reiterate his concerns regarding Dr. Senegor's patient care and retaliation.

22   Dr. Bahari received no direct response.

23         36.     On or about April 17, 2018, Dr. Bahari alerted San Joaquin Hospital's Risk

24   Management Department to his patient safety concerns caused by Dr. Senegor. Dr. Bahari

25   specifically raised concerns about Dr. Senegor's frequent surgical complications, failure to take

26   pre-op scans, and failure to provide other doctors with adequate patient documentation and

27   information for follow-up care. Dr. Bahari also complained of San Joaquin Hospital's

28   indifference to these complaints over the previous year. Dr. Bahari received no response or

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

---

11

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

acknowledgment from the Risk Management Department.

37.     In or around mid-April 2018, on information and belief, Dr. Bahari alleges Dr. Senegor continued to spread his false accusation against Dr. Bahari to San Joaquin Hospital leadership. Dr. Senegor continued to spread this rumor that Dr. Bahari had caused a swollen neck in a patient, hoping it would result in Dr. Bahari's termination from San Joaquin Hospital. Dr. Onkar Judge ("Dr. Judge"), the Medical Executive Committee Director, determined Dr. Senegor's accusation was baseless and absurd, as there was no medical connection between surgery duration and the patient's swollen neck. As such, San Joaquin Hospital leadership took no action on the matter.

38.     On or about May 4, 2018, Dr. Bahari prepared a letter to the San Joaquin Hospital Board of Directors to outline his complaints about patient safety, discrimination, retaliation, and the managerial and administrative indifference to Dr. Bahari's complaints. One of Dr. Bahari's coworkers knew about the letter and warned him not to send it and risk further retaliation. Dr. Bahari ultimately did not send the letter to the Board of Directors for fear that Culberson would fire him for going over Culberson's head.

39.     On or about May 7, 2018, Dr. Bahari met with Culberson and Dr. Kapre regarding his complaints about Dr. Senegor's patient safety risks, and discriminatory and retaliatory conduct. In the meeting, Culberson assured Dr. Bahari that he planned to remove Dr. Senegor from Chief of Neurosurgery and either find a new hire to replace him, or rotate the administrative duties between the other neurosurgeons on a yearly basis. Dr. Bahari also complained in this meeting about the Trauma Team's failure to comply with EMTALA by disregarding Dr. Bahari's recommendations for high-risk patients to be transferred to facilities with higher levels of care. Dr. Kapre and Culberson did not directly respond to this complaint.

40.     In or around mid-May 2018, Dr. Bahari was informed by San Joaquin Hospital leadership that Dr. Senegor's criticisms of him regarding the patient with the swollen neck were incorrect.

41.     On or about May 30, 2018, Dr. Senegor pulled Dr. Bahari completely off of the regular on-call schedule. In doing so, Dr. Senegor deprived Dr. Bahari of his normal involvement

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

in setting the call schedule with Dr. Senegor and Dr. Oladunjoye. The same day, Dr. Bahari complained to Dr. Judge about the decision to pull him from the on-call schedule. Dr. Judge immediately called Dr. Kapre, who said the matter was entirely in Culberson's hands. As such, Dr. Bahari set up a meeting with Dr. Kapre and Culberson to address the on-call schedule and convey his complaints about patient safety, discrimination, retaliation, and employee health and safety.

42.     On or about June 1, 2018, Dr. Bahari complained to Dr. Matolo via email about patient safety risks posed by Dr. Senegor. He also complained that Dr. Senegor pulled him from the on-call schedule because Dr. Bahari raised these patient safety concerns. Dr. Bahari received no response from Dr. Matolo.

43.     On or about June 1, 2018, Dr. Bahari met with Dr. Kapre and Culberson to complain about being pulled from the on-call schedule in retaliation for making complaints about Dr. Senegor. Dr. Kapre confirmed Dr. Senegor had unilaterally decided to remove Dr. Bahari from the on-call schedule for June. Dr. Kapre also confirmed that Dr. Senegor's accusation about Dr. Bahari's patient was baseless. Dr. Kapre promised she and Culberson would meet with Dr. Bahari and Dr. Senegor individually to resolve the on-call schedule issue. Dr. Kapre and Culberson never met with Dr. Bahari again, and San Joaquin Hospital never returned Dr. Bahari to the on-call schedule.

44.     On or around June 18, 2018, San Joaquin Hospital terminated Dr. Bahari's employment. Culberson explained that Dr. Bahari was "not a good fit" and "not board-certified." Culberson alternatively explained that they could no longer keep Dr. Bahari on because San Joaquin Hospital had not achieved the status of a Level II Trauma Center. Dr. Bahari pointed out to Culberson that Dr. Oladunjoye also had not yet completed the board certification process. Dr. Bahari also pointed out to Culberson that his employment contract acknowledged that Dr. Bahari was not yet board-certified and established no deadline by which he had to attain board certification. Culberson provided no substantive response, saying only, "The decision has already been made."

///

Plaintiff's Verified Complaint for Damages and Demand for Jury Trial        Lawrance A. Bohm, Esq.
*Bahari v. County of San Joaquin, et al.*                                   Kelsey K. Ciarimboli, Esq.
Case No.:                                                                    Scott C. Zienty, Esq.

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

45. Less than a month later, San Joaquin Hospital posted a job announcement online to fill the vacant neurosurgeon position, despite still being a Level III Trauma Center. The position required a spinal specialty and a current California medical license, however, it did not require current board certification.

46. On November 16, 2018, Plaintiff provided notice to San Joaquin County of his intent to file the present lawsuit, pursuant to Government Code section 910. Plaintiff completed and submitted a Government Tort Claim Form with the County of San Joaquin's Claim for Damages Form.

47. On December 19, 2018, Plaintiff's Government Tort Claim submitted to San Joaquin County was rejected.

## FIRST CAUSE OF ACTION

### Violation of Labor Code section 1102.5

48. The allegations set forth in this complaint are hereby re-alleged and incorporated by reference.

49. This cause of action is asserted against Defendant.

50. At all relevant times, Plaintiff was an employee of Defendant.

51. Labor Code section 98.6 states that an employer may not "discharge an employee or in any manner discriminate against any employee . . . because the employee . . . has filed a bona fide complaint or claim or instituted or caused to be instituted any proceeding under or relating to his or her rights, which are under the jurisdiction of the Labor Commissioner." Labor Code section 1102.5, subdivision (b), states that "[a]n employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or

Plaintiff's Verified Complaint for Damages and Demand for Jury Trial          Lawrance A. Bohm, Esq.
*Bahari v. County of San Joaquin, et al.*          Kelsey K. Ciarimboli, Esq.
Case No.:          Scott C. Zienty, Esq.

1  federal rule or regulation, regardless of whether disclosing the information is part of the

2  employee's job duties." Labor Code section 1102.5, subdivision (c), states that an "employer may

3  not retaliate against an employee for refusing to participate in an activity that would result in a

4  violation of state or federal statute, or a violation or noncompliance with a state or federal rule or

5  regulation."

6       52.    Plaintiff made numerous protected complaints to persons with authority over him

7  at San Joaquin Hospital including, but not limited to, complaints about: patient safety; an unsafe

8  and unhealthy working environment; discriminatory and retaliatory behavior by Defendant

9  management; violations of EMTALA; and fraud. Also, Plaintiff refused to perform work he

10  reasonably believed to violate federal, state or municipal laws and/or regulations. Defendant's

11  conduct violated statutes and regulations including, but not limited to: Labor Code sections 232.5,

12  512, 6310, 6311, 6400, 6401, 6402, 6403, and 6404; Health and Safety Code section 1278.5; 42

13  U.S. Code 1395(d)(d) - Emergency Medical Treatment and Labor Act; 31 U.S. Code 3729 - False

14  Claims Act.

15       53.    Defendant violated Labor Code sections 98.6 and 1102.5 when it unlawfully

16  retaliated against Plaintiff by taking adverse employment actions against Plaintiff, including but

17  not limited to: making unfavorable changes to Plaintiff's work schedule, micromanaging his

18  work, subjecting Plaintiff to threatening and intimidating behavior, manipulating job duties and

19  activities, creating of the overall hostile terms and conditions of employment, and wrongfully

20  terminating Plaintiff's employment.

21       54.    The conduct of Defendant and its agents and employees was a substantial factor

22  in causing Plaintiff's harm.

23       55.    As an actual and proximate result of the aforementioned violations, Plaintiff has

24  been harmed in an amount according to proof, but in an amount in excess of the jurisdiction of

25  this Court.

26       56.    As an actual and proximate result of Defendant's aforementioned acts, Plaintiff

27  has lost wages, benefits, and other out-of-pocket expenses.

28  ///

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

15

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

57.     As an actual and proximate result of Defendant's aforementioned acts, Plaintiff suffered physical injury, including, but not limited to, insomnia, headaches, loss of appetite, weight loss, and weight gain. Plaintiff claims general damages for physical injury in an amount according to proof at time of trial.

58.     As an actual and proximate result of Defendant's aforementioned acts, Plaintiff suffered mental upset, emotional distress, and/or other psychological injury. Plaintiff claims general damages for mental upset, emotional distress, and other psychological injury in an amount according to proof at time of trial.

## SECOND CAUSE OF ACTION

### Violation of Labor Code sections 6310 and 6311

59.     The allegations set forth in this complaint are hereby re-alleged and incorporated by reference.

60.     This cause of action is asserted Defendant.

61.     At all relevant times, Plaintiff was an employee of Defendant.

62.     Labor Code section 6310 states, "Any employee who is discharged, threatened with discharge, demoted, suspended, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because the employee has made a bona fide oral or written complaint to the division, other governmental agencies having statutory responsibility for or assisting the division with reference to employee safety or health, his or her employer, or his or her representative, of unsafe working conditions, or work practices, in his or her employment or place of employment, or has participated in an employer-employee occupational health and safety committee, shall be entitled to reinstatement and reimbursement for lost wages and work benefits caused by the acts of the employer. Any employer who willfully refuses to rehire, promote, or otherwise restore an employee or former employee who has been determined to be eligible for rehiring or promotion by a grievance procedure, arbitration, or hearing authorized by law, is guilty of a misdemeanor."

63.     Labor Code section 6311 states, "No employee shall be laid off or discharged for refusing to perform work in the performance of which this code, including Section 6400, any

Bohm Law Group, Inc.
4600 Northgate Boulevard, Suite 210
Sacramento, California 95834

16

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

occupational safety or health standard or any safety order of the division or standards board will be violated, where the violation would create a real and apparent hazard to the employee or his or her fellow employees. Any employee who is laid off or discharged in violation of this section or is otherwise not paid because he or she refused to perform work in the performance of which this code, any occupational safety or health standard or any safety order of the division or standards board will be violated and where the violation would create a real and apparent hazard to the employee or his or her fellow employees shall have a right of action for wages for the time the employee is without work as a result of the layoff or discharge."

64.    The Joint Commission states, "Intimidating and disruptive behaviors can foster medical errors, contribute to poor patient satisfaction and to preventable adverse outcomes. . . Safety and quality of patient care is dependent on teamwork, communication, and a collaborative work environment. To assure quality and to promote a culture of safety, health care organizations must address the problem of behaviors that threaten the performance of the health care team. Intimidating and disruptive behaviors include overt actions such as verbal outbursts and physical threats, as well as passive activities such as refusing to perform assigned tasks or quietly exhibiting uncooperative attitudes during routine activities…All intimidating and disruptive behaviors are unprofessional and should not be tolerated."

65.    The Joint Commission acknowledges, "The presence of intimidating and disruptive behaviors in an organization [] erodes professional behavior and *creates an unhealthy or even hostile work environment*…." [Emphasis added.] An unhealthy and unsafe work environment threatens the physical and psychological safety of employees and members of the medical staff, and creates an unsafe environment for patients seeking care in the medical facility. (A true and correct copy of The Joint Commission, Sentinel Event Alert: Behaviors that Undermine a Culture of Safety is attached hereto as **Exhibit 1**.)

66.    During Plaintiff's employment, Plaintiff complained orally and in writing to management about the unsafe working environment, including, but not limited to, the intimidating and disruptive behaviors of his co-workers and supervisors, unsafe, unsupported and under-resourced operations and other medical procedures, and unnecessary risks to patient safety.

B<small>OHM</small> L<small>AW</small> G<small>ROUP</small>, I<small>NC.</small>
4600 N<small>ORTHGATE</small> B<small>OULEVARD</small>, S<small>UITE</small> 210
S<small>ACRAMENTO</small>, C<small>ALIFORNIA</small> 95834

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

///

67.     The unhealthy and unsafe working environment at Defendant was physically and psychologically unsafe for Plaintiff.

68.     Defendant violated Labor Code sections 6310, 6311, 6400, 6401, 6402, 6403, 6404 and 6405 by retaliating against Plaintiff for his protected complaints regarding the unsafe workplace, the unhealthy workplace, patient safety and his working conditions by making unfavorable changes to Plaintiff's work schedule, micromanaging his work, subjecting Plaintiff to threatening and intimidating behavior, manipulating job duties and activities, creating overall hostile terms and conditions of employment, and wrongfully terminating Plaintiff's employment.

69.     As an actual and proximate result of Defendant's aforementioned violations, Plaintiff has been damaged in an amount according to proof, but in an amount in excess of the jurisdiction of this Court.

70.     As an actual and proximate result of Defendant's aforementioned acts, Plaintiff has lost wages, benefits, and other out of pocket expenses.

71.     As an actual and proximate result of Defendant's aforementioned acts, Plaintiff suffered physical injury, including, but not limited to, insomnia, headaches, loss of appetite, weight loss, and weight gain. Plaintiff claims general damages for physical injury in an amount according to proof at time of trial.

72.     As an actual and proximate result of Defendant's aforementioned acts, Plaintiff also suffered mental upset, emotional distress, and/or psychological injury. Plaintiff claims general damages for mental upset, emotional distress, and/or psychological injury in an amount according to proof at time of trial.

### **THIRD CAUSE OF ACTION**

### **Violation of Health and Safety Code section 1278.5**

73.     The allegations set forth in this complaint are hereby re-alleged and incorporated by reference.

74.     This cause of action is asserted against Defendant.

75.     The California Legislature has determined that, in order to protect patients, "it is

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**     Lawrance A. Bohm, Esq.
*Bahari v. County of San Joaquin, et al.*     Kelsey K. Ciarimboli, Esq.
Case No.:     Scott C. Zienty, Esq.

Bohm Law Group, Inc.
4600 Northgate Boulevard, Suite 210
Sacramento, California 95834

the public policy of the State of California to encourage patients, nurses, members of the medical staff, and other health care workers to notify government entities of suspected unsafe patient care and hospital conditions." San Joaquin Hospital is a "health facility" pursuant to Health and Safety Code section 1250, subdivision (i).

76.     Therefore, pursuant to California Health and Safety Code section 1278.5, subdivision (b), "[n]o health facility shall discriminate or retaliate, in any manner, against any patient, employee, member of the medical staff, or any other health care worker of the health facility because that person . . . [p]resented a grievance, complaint, or report to the facility, to an entity or agency responsible for accrediting or evaluating the facility, or the medical staff of the facility, or to any other governmental entity." Pursuant to section 1278.5, subdivision (i), "'health facility' means any facility defined under this chapter, including, but not limited to, the facility's administrative personnel, employees, boards, and committees of the board, and medical staff."

77.     Plaintiff was an employee of Defendant and a member of the medical staff of San Joaquin Hospital.

78.     Defendant harassed, discriminated, and retaliated against Plaintiff because he reported concerns about patient care, services, and hospital conditions.

79.     Plaintiff presented a grievance, complaint, or report to the facility regarding unsafe patient care, services and hospital conditions. These issues involved patient care as well as violations of compliance statutes and regulations.

80.     Section 1278.5, subdivision (d)(1) states, "There shall be a rebuttable presumption that discriminatory action was/were taken by the health facility, or by the entity that owns or operates that health facility, or that owns or operates any other health facility, in retaliation against an employee, member of the medical staff, or any other health care worker of the facility, if responsible staff at the facility or the entity that owns or operates the facility had knowledge of the actions, participation, or cooperation of the person responsible for any acts described in paragraph (1) of subdivision (b), and the discriminatory action occurs within 120 days of the filing of the grievance or complaint by the employee, member of the medical staff or any other health care worker of the facility."

Bohm Law Group, Inc.
4600 Northgate Boulevard, Suite 210
Sacramento, California 95834

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

81.     Discriminatory and retaliatory actions, including, but not limited to, making unfavorable changes to Plaintiff's work schedule, micromanaging his work, subjecting him to threatening and intimidating behavior, manipulating job duties and activities, creating overall hostile terms and conditions of employment, and wrongfully terminating Plaintiff's employment were taken against Plaintiff within 120 days of filing grievances regarding patient care, services, and/or hospital conditions.

82.     California Health and Safety Code section 1278.5 has no administrative or judicial exhaustion requirement.

83.     As a proximate result of Defendant's aforementioned acts, Plaintiff has been damaged in an amount according to proof, but in an amount in excess of the jurisdiction of this Court.

84.     As an actual and proximate result of Defendant's unlawful conduct, Plaintiff has lost wages, benefits, and has incurred other out-of-pocket expenses.

85.     As an actual and proximate result of Defendant's aforementioned acts, Plaintiff suffered physical injury, including, but not limited to, insomnia, headaches, loss of appetite, weight loss, and weight gain. Plaintiff claims general damages for physical injury in an amount according to proof at time of trial.

86.     As an actual and proximate result of Defendant's aforementioned acts, Plaintiff also suffered mental upset, emotional distress and/or other psychological injury. Plaintiff claims general damages for mental upset, emotional distress and/or other psychological injury in an amount according to proof at time of trial.

## FOURTH CAUSE OF ACTION

### False Promise in Violation of Civil Code sections 1709 and 1710.4

87.     The allegations set forth in this complaint are hereby re-alleged and incorporated by reference.

88.     This cause of action is asserted against Defendant.

89.     Defendant made a promise to Plaintiff.

90.     Defendant promised including but not limited to the following:

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

20

Plaintiff's Verified Complaint for Damages and Demand for Jury Trial
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

(1) Defendant promised Plaintiff that board certification was not an express condition of employment with San Joaquin Hospital. Defendant further promised Plaintiff there was no deadline after which board certification would be an express condition of employment with San Joaquin Hospital. However, Defendant did not perform this promise when it ultimately terminated Plaintiff and relied on his lack of board certification as the grounds for the termination.

(2) Defendant promised Plaintiff he would be allowed time to become board certified if he so chose. In this promise included the promise that Plaintiff would be given "four weeks off take your oral board certification examination when it is scheduled," and that once the board certification was complete, Plaintiff would receive an additional $20,000 pay annually. Defendant did not perform these promises when it did not permit Plaintiff time to become board certified, when it terminated him, failed to provide him surgeries, and pulled him from the call schedule.

(3) Defendant promised Plaintiff the call schedule would be divided between three neurosurgeons, with "at least fifteen days of call each month that can be paid at the extra call rate" of $2,000 per day. However, Defendant did not perform this promise when it hired a fourth neurosurgeon thereby depriving Plaintiff extra call opportunities. Further, Dr. Senegor pulled Plaintiff entirely from the call schedule on May 30, 2018, thereby denying him extra call opportunities.

(4) Defendant promised Plaintiff ninety days' notice of termination of the contract. However, Defendant did not perform its promise when Plaintiff's termination letter from June 18, 2018 established Plaintiff's last working day as June 30, 2018 and indicated Defendant would pay Plaintiff ninety days of his base pay. In doing so, Defendant denied Plaintiff over two and a half months of extra call opportunities, incentive pay, and surgeries needed for board certification.

(5) Defendant promised Plaintiff the support of allied health professionals during his employment with San Joaquin Hospital. Defendant did not perform this promise

Plaintiff's Verified Complaint for Damages and Demand for Jury Trial
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

when it routinely failed to provide Plaintiff with sufficient allied health professionals.

    (6) Defendant promised Plaintiff the opportunity to perform surgeries necessary to achieve board certification. However, Defendant did not perform this promise when it deprived Plaintiff of surgeries and diverted patients away from Plaintiff and toward other neurosurgeons.

91.    Defendant did not intend to perform the promises when they were made.

92.    Defendant intended that Plaintiff rely on these promises as true.

93.    Plaintiff reasonably relied on Defendant's promise.

94.    Defendant failed to perform the promised acts.

95.    Plaintiff was harmed by Defendant's deceit and failure to fulfill the promise.

96.    Plaintiff's reliance of Defendant's promises was a substantial factor in causing him harm.

97.    As a proximate result of Defendant's aforementioned acts, Plaintiff has been damaged in an amount according to proof, but in an amount in excess of the jurisdiction of this Court.

98.    As an actual and proximate result of Defendant's unlawful conduct, Plaintiff has lost wages, benefits, and has incurred other out-of-pocket expenses.

99.    As an actual and proximate result of Defendant's aforementioned acts, Plaintiff suffered physical injury, including, but not limited to, insomnia, headaches, loss of appetite, weight loss, and weight gain. Plaintiff claims general damages for physical injury in an amount according to proof at time of trial.

100.    As an actual and proximate result of Defendant's aforementioned acts, Plaintiff also suffered mental upset, emotional distress and/or other psychological injury. Plaintiff claims general damages for mental upset, emotional distress and/or other psychological injury in an amount according to proof at time of trial.

///

///

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

## FIFTH CAUSE OF ACTION

### Breach of Contract

101.   The allegations set forth in this complaint are hereby re-alleged and incorporated by reference.

102.   This cause of action is asserted against Defendant.

103.   Plaintiff and Defendant entered into a contract.

104.   Plaintiff performed all, or substantially all, of the significant things the contract required him to do.

105.   Defendant failed to what the contract required it to do, including but not limited to the following:

106.   In its Physician Employment Agreement, **Exhibit 2**– Duties and Responsibilities, Neurosurgery Services Compensation and Incentive Plan, and "Revised Offer" conveyed to Plaintiff on October 1, 2016, Defendant contractually agreed with Plaintiff to, among other things, the following:

a)     Board certification was not an express condition of Plaintiff's employment with San Joaquin Hospital. Defendant further agreed there was no deadline after which board certification would become an express condition of Plaintiff's employment with San Joaquin Hospital. However, Defendant breached the contract when it ultimately terminated Plaintiff and relied on his lack of board certification as the grounds for the termination.

b)     Plaintiff would be allowed time to become board certified, if he chose to do so. This agreement included the additional agreements that Plaintiff would be given "four weeks off take your oral board certification examination when it is scheduled," and that once the board certification was complete, Plaintiff would receive an additional $20,000 pay annually. Defendant breached the contract when it did not permit Plaintiff time to become board certified, when it terminated him.

c)     The neurosurgery call schedule would be divided between three neurosurgeons, with "at least fifteen days of call each month that can be paid at the extra call rate" of $2,000 per day. However, Defendant breached the contract when it hired a fourth neurosurgeon, thereby

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**
*Bahari v. County of San Joaquin, et al.*
Case No.:                                    Lawrance A. Bohm, Esq.
                                             Kelsey K. Ciarimboli, Esq.
                                             Scott C. Zienty, Esq.

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

depriving Plaintiff extra call opportunities. Further, Dr. Senegor pulled Plaintiff entirely from the call schedule on May 30, 2018, thereby denying him extra call opportunities.

d)     Plaintiff would receive ninety days' notice of termination of the contract. However, Defendant breached the contract when Plaintiff's termination letter from June 18, 2018 established Plaintiff's last working day as June 30, 2018 and indicated Defendant would pay Plaintiff ninety days of his base pay. In doing so, Defendant denied Plaintiff over two and a half months of extra call opportunities, incentive pay, and surgeries needed for board certification.

e)     Plaintiff would be provided support of allied health professionals during his employment with San Joaquin Hospital. Defendant breached the contract when it routinely failed to provide Plaintiff with sufficient allied health professionals.

f)     Plaintiff would have the opportunity to have perform surgeries necessary to achieve board certification. However, Defendant breached the contract when it deprived Plaintiff of surgeries and diverted patients away from Plaintiff and toward other neurosurgeons.

107.    Plaintiff was harmed by Defendant's breach of contract.

108.    Defendant's failure to perform the required terms and conditions of the contract foreseeably caused Plaintiff to suffer general, consequential, and incidental damages, including economic damages in excess of this Court's jurisdiction according to proof at trial. Both Plaintiff and Defendant knew or could reasonably have foreseen that the harm and/or special circumstances were likely to occur in the ordinary course of events as a result of the breach of the contract. Accordingly, Defendant's conduct was a breach of contract.

109.    As an actual and proximate result of Defendant's unlawful conduct, Plaintiff has lost wages or profits, benefits, and has incurred other out-of-pocket expenses.

## SIXTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

110.    The allegations set forth in this complaint are hereby re-alleged and incorporated by reference.

111.    This cause of action is asserted against Defendant.

112.    Plaintiff and Defendant entered into a contract.

24

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

113.     Plaintiff did all, or substantially all of the significant things the contract required him to do.

114.     Defendant entered into a contract with Plaintiff, giving Plaintiff the right to earn up to $140,000 beyond his base pay through the Neurosurgeon Incentive Plan. Further, the contract gave Plaintiff the right to earn $2,000 per day of extra call shifts. However, Defendant unfairly, malevolently, and intentionally interfered with Plaintiff's rights under the contract by, among other things, manipulating his schedule and work assignments, hiring an additional neurosurgeon, diverting patients and surgeries from Plaintiff, and depriving him of resources, all of which drastically undercut Plaintiff's right to receive benefits of the Neurosurgeon Incentive Plan and extra call days.

115.     The allegations set forth in this complaint set forth the malevolent and intentional behavior by Defendant for the purpose of breaching the implied covenant of good faith and fair dealing and demonstrate the bad faith of Defendant at all relevant times.

116.     Plaintiff was harmed by Defendant's conduct.

117.     Defendant's unfair interference with Plaintiff's right to receive the benefits of the contract was foreseeable in causing Plaintiff to suffer general, consequential, and incidental damages, including economic damages in excess of this Court's jurisdiction according to proof at trial. Both Plaintiff and Defendant knew or could reasonably have foreseen that the harm and/or special circumstances were likely to occur in the ordinary course of events as a result of the breach of the contract. Accordingly, Defendant's conduct was a breach of implied covenant of good faith and fair dealing.

118.     As a proximate result of Defendant's aforementioned acts, Plaintiff has been damaged in an amount according to proof, but in an amount in excess of the jurisdiction of this Court.

119.     As an actual and proximate result of Defendant's unlawful conduct, Plaintiff has lost wages, benefits, and has incurred other out-of-pocket expenses.

120.     As an actual and proximate result of Defendant's aforementioned acts, Plaintiff suffered physical injury, including, but not limited to, insomnia, headaches, loss of appetite,

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

weight loss, and weight gain. Plaintiff claims general damages for physical injury in an amount according to proof at time of trial.

121.    As an actual and proximate result of Defendant's aforementioned acts, Plaintiff also suffered mental upset, emotional distress and/or other psychological injury. Plaintiff claims general damages for mental upset, emotional distress and/or other psychological injury in an amount according to proof at time of trial.

## SEVENTH CAUSE OF ACTION

### Fraud/Intentional Misrepresentation

122.    The allegations set forth in this complaint are hereby re-alleged and incorporated by reference.

123.    This cause of action is asserted against Defendant.

124.    Defendant represented to Plaintiff that certain facts were true, including, but not limited to, the following:

(1) Defendant represented to Plaintiff that board certification was not an express condition of employment with San Joaquin Hospital. Defendant further represented to Plaintiff that there was no deadline after which board certification would be an express condition of employment with San Joaquin Hospital. However, Defendant ultimately terminated Plaintiff and relied on his lack of board certification as the grounds for the termination.

(2) Defendant represented to Plaintiff he would be allowed time to become board certified if he so chose. This included the representation that Plaintiff would be given "four weeks off take your oral board certification examination when it is scheduled," and that once the board certification was complete, Plaintiff would receive an additional $20,000 pay annually. Defendant did not permit Plaintiff time to become board certified, when it terminated him.

(3) Defendant represented to Plaintiff the call schedule would be divided between three neurosurgeons, with "at least fifteen days of call each month that can be paid at the extra call rate" of $2,000 per day. However, Defendant hired a fourth

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

neurosurgeon thereby depriving Plaintiff extra call opportunities. Further, Dr. Senegor pulled Plaintiff entirely from the call schedule on May 30, 2018, thereby denying him extra call opportunities.

(4) Defendant represented to Plaintiff he was entitled to and would receive ninety days' notice of termination of the contract. However, Plaintiff's termination letter from June 18, 2018 established Plaintiff's last working day as June 30, 2018 and indicated Defendant would pay Plaintiff ninety days of his base pay. In doing so, Defendant denied Plaintiff over two and a half months of extra call opportunities, incentive pay, and surgeries needed for board certification.

(5) Defendant represented to Plaintiff he was entitled to the support of allied health professionals during his employment with San Joaquin Hospital. Defendant routinely failed to provide Plaintiff with sufficient allied health professionals.

(6) Defendant represented to Plaintiff he was entitled to the opportunity to perform surgeries necessary to achieve board certification. However, Defendant deprived Plaintiff of surgeries and diverted patients away from Plaintiff and toward other neurosurgeons.

125.    Defendant's representations were false.

126.    Defendant knew that the representations were false when they were made, or made the representations recklessly and without regard for its truth.

127.    Defendant intended that Plaintiff rely on the representations.

128.    Plaintiff reasonably relied on Defendant's representations.

129.    Plaintiff was harmed.

130.    Plaintiff's reliance on Defendant's representation was a substantial factor in causing Plaintiff to suffer general, consequential, and incidental damages, including economic damages in excess of this Court's jurisdiction according to proof at trial. Both Plaintiff and Defendant knew or could reasonably have foreseen that the harm and/or special circumstances were likely to occur in the ordinary course of events as a result of the breach of the contract. Accordingly, Defendant's conduct was intentional misrepresentation.

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

131.    As a proximate result of Defendant's aforementioned acts, Plaintiff has been damaged in an amount according to proof, but in an amount in excess of the jurisdiction of this Court.

132.    As an actual and proximate result of Defendant's unlawful conduct, Plaintiff has lost wages, benefits, and has incurred other out-of-pocket expenses.

133.    As an actual and proximate result of Defendant's aforementioned acts, Plaintiff suffered physical injury, including, but not limited to, insomnia, headaches, loss of appetite, weight loss, and weight gain. Plaintiff claims general damages for physical injury in an amount according to proof at time of trial.

134.    As an actual and proximate result of Defendant's aforementioned acts, Plaintiff also suffered mental upset, emotional distress and/or other psychological injury. Plaintiff claims general damages for mental upset, emotional distress and/or other psychological injury in an amount according to proof at time of trial.

## EIGHTH CAUSE OF ACTION

### Negligent Misrepresentation

135.    The allegations set forth in this complaint are hereby re-alleged and incorporated by reference.

136.    This cause of action is asserted against Defendant.

137.    Defendant represented to Plaintiff that certain facts were true, including but not limited to the following:

(1) Defendant represented to Plaintiff that board certification was not an express condition of employment with San Joaquin Hospital. Defendant further represented to Plaintiff that there was no deadline after which board certification would be an express condition of employment with San Joaquin Hospital. However, Defendant ultimately terminated Plaintiff and relied on his lack of board certification as the grounds for the termination.

(2) Defendant represented to Plaintiff he would be allowed time to become board certified if he so chose. This included the representation that Plaintiff would be

Bohm Law Group, Inc.
4600 Northgate Boulevard, Suite 210
Sacramento, California 95834

28

Plaintiff's Verified Complaint for Damages and Demand for Jury Trial
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

given "four weeks off take your oral board certification examination when it is scheduled," and that once the board certification was complete, Plaintiff would receive an additional $20,000 pay annually. Defendant did not permit Plaintiff time to become board certified, when it terminated him.

(3) Defendant represented to Plaintiff that the call schedule would be divided between three neurosurgeons, with "at least fifteen days of call each month that can be paid at the extra call rate" of $2,000 per day. However, Defendant hired a fourth neurosurgeon thereby depriving Plaintiff extra call opportunities. Further, Dr. Senegor pulled Plaintiff entirely from the call schedule on May 30, 2018, thereby denying him extra call opportunities.

(4) Defendant represented to Plaintiff he was entitled to and would receive ninety days' notice of termination of the contract. However, Plaintiff's termination letter from June 18, 2018 established Plaintiff's last working day as June 30, 2018 and indicated Defendant would pay Plaintiff ninety days of his base pay. In doing so, Defendant denied Plaintiff over two and a half months of extra call opportunities, incentive pay, and surgeries needed for board certification.

(5) Defendant represented to Plaintiff he was entitled to and would receive the support of allied health professionals during his employment with San Joaquin Hospital. Defendant routinely failed to provide Plaintiff with sufficient allied health professionals.

(6) Defendant represented to Plaintiff he was entitled to and would receive the opportunity to have perform surgeries necessary to achieve board certification. However, Defendant deprived Plaintiff of surgeries and diverted patients away from Plaintiff and toward other neurosurgeons.

138.   Additionally, Defendant represented certain conditions of employment which were demonstrated by Defendant's behavior and conduct to be false.

139.   Defendant's representations were not true.

///

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

140.   Although Defendant may have honestly believed that the representations were true, Defendant had no reasonable grounds for believing the representations were true when they were made.

141.   Defendant intended that Plaintiff rely on the representations.

142.   Plaintiff reasonably relied on Defendant's representations.

143.   Plaintiff was harmed.

144.   Plaintiff's reliance on Defendant's representations was a substantial factor in causing Plaintiff to suffer general, consequential, and incidental damages, including economic damages in excess of this Court's jurisdiction according to proof at trial. Both Plaintiff and Defendant knew or could reasonably have foreseen that the harm and/or special circumstances were likely to occur in the ordinary course of events as a result of the breach of the contract. Accordingly, Defendant's conduct was negligent misrepresentation.

145.   As a proximate result of Defendant's aforementioned acts, Plaintiff has been damaged in an amount according to proof, but in an amount in excess of the jurisdiction of this Court.

146.   As an actual and proximate result of Defendant's unlawful conduct, Plaintiff has lost wages, benefits, and has incurred other out-of-pocket expenses.

147.   As an actual and proximate result of Defendant's aforementioned acts, Plaintiff suffered physical injury, including, but not limited to, insomnia, headaches, loss of appetite, weight loss, and weight gain. Plaintiff claims general damages for physical injury in an amount according to proof at time of trial.

148.   As an actual and proximate result of Defendant's aforementioned acts, Plaintiff also suffered mental upset, emotional distress and/or other psychological injury. Plaintiff claims general damages for mental upset, emotional distress and/or other psychological injury in an amount according to proof at time of trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant, and each of them, as follows:

Plaintiff's Verified Complaint for Damages and Demand for Jury Trial
*Bahari v. County of San Joaquin, et al.*
Case No.:

Lawrance A. Bohm, Esq.
Kelsey K. Ciarimboli, Esq.
Scott C. Zienty, Esq.

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

1.      For compensatory damages, including, but not limited to lost wages and emotional distress in the amount according to proof;

2.      For attorneys' fees and costs pursuant to all applicable statues or legal principles;

3.      For cost of suit incurred;

4.      For prejudgment interest on all amounts claimed pursuant to Civil Code sections 3287 and/or 3288; and

5.      For such other and further relief as the Court may deem proper.

Date: June 5, 2019                    By:   */s/ Scott C. Zienty, Esq.*
                                            LAWRANCE A. BOHM, ESQ.
                                            KELSEY K. CIARIMBOLI, ESQ.
                                            SCOTT C. ZIENTY, ESQ.

                                            Attorneys for Plaintiff,
                                            ABBAS BAHARI

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury for this matter.

Date: June 5, 2019                    By:   */s/ Scott C. Zienty, Esq.*
                                              LAWRANCE A. BOHM, ESQ.
                                            KELSEY K. CIARIMBOLI, ESQ.
                                          SCOTT C. ZIENTY, ESQ.

                                            Attorneys for Plaintiff,
                                            ABBAS BAHARI

Bohm Law Group, Inc.
4600 Northgate Boulevard, Suite 210
Sacramento, California 95834

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**        Lawrance A. Bohm, Esq.
*Bahari v. County of San Joaquin, et al.*                             Kelsey K. Ciarimboli, Esq.
Case No.:                                        Scott C. Zienty, Esq.

## <u>VERIFICATION OF COMPLAINT FOR DAMAGES</u>

I, ABBAS BAHARI, have read the attached Complaint for Damages and hereby attest that the same is true of my own knowledge, except as to those matters, which are therein stated on my information or belief, and as to those matter that I believe it to be true.

I declare under penalty of perjury under to the laws of the State of California that the foregoing is true and correct.

This Verification was executed on June 2, 2019 , in ~~San Diego, CA 92127~~ Sylvania, OH 43560.

_____
ABBAS BAHARI

---

**VERIFICATION OF COMPLAINT FOR DAMAGES**

# EXHIBIT 1

Case 2:19-cv-01023-KJM-DB   Document 1   Filed 06/05/19   Page 34 of 48

**The Joint Commission**

## Sentinel Event Alert

July 09, 2008

**Issue 40, July 9, 2008**

# Behaviors that undermine a culture of safety

Intimidating and disruptive behaviors can foster medical errors,(1,2,3) contribute to poor patient satisfaction and to preventable adverse outcomes,(1,4,5) increase the cost of care,(4,5) and cause qualified clinicians, administrators and managers to seek new positions in more professional environments. (1,6) Safety and quality of patient care is dependent on teamwork, communication, and a collaborative work environment. To assure quality and to promote a culture of safety, health care organizations must address the problem of behaviors that threaten the performance of the health care team.

Intimidating and disruptive behaviors include overt actions such as verbal outbursts and physical threats, as well as passive activities such as refusing to perform assigned tasks or quietly exhibiting uncooperative attitudes during routine activities. Intimidating and disruptive behaviors are often manifested by health care professionals in positions of power. Such behaviors include reluctance or refusal to answer questions, return phone calls or pages; condescending language or voice intonation; and impatience with questions.(2) Overt and passive behaviors undermine team effectiveness and can compromise the safety of patients.(7, 8, 11) All intimidating and disruptive behaviors are unprofessional and should not be tolerated.

Intimidating and disruptive behaviors in health care organizations are not rare.(1,2,7,8,9)  A survey on intimidation conducted by the Institute for Safe Medication Practices found that 40 percent of clinicians have kept quiet or remained passive during patient care events rather than question a known intimidator.(2,10) While most formal research centers on intimidating and disruptive behaviors among physicians and nurses, there is evidence that these behaviors occur among other health care professionals, such as pharmacists, therapists, and support staff, as well as among administrators. (1,2) Several surveys have found that most care providers have experienced or witnessed intimidating or disruptive behaviors.(1,2,8,12,13) These behaviors are not limited to one gender and occur during interactions within and across disciplines.(1,2,7) Nor are such behaviors confined to the small number of individuals who habitually exhibit them.(2) It is likely that these individuals are not involved in the large majority of episodes of intimidating or disruptive behaviors. It is important that organizations recognize that it is the behaviors that threaten patient safety, irrespective of who engages in them.

The majority of health care professionals enter their chosen discipline for altruistic reasons and have a strong interest in caring for and helping other human beings. The preponderance of these individuals carry out their duties in a manner consistent with this idealism and maintain high levels of professionalism. The presence of intimidating and disruptive behaviors in an organization, however, erodes professional behavior and creates an unhealthy or even hostile work environment – one that is readily recognized by patients and their families. Health care organizations that ignore these behaviors also expose themselves to litigation from both employees and patients. Studies link patient complaints about unprofessional, disruptive behaviors and malpractice risk.(13,14,15) "Any behavior which impairs the health care team's ability to function well creates risk," says Gerald Hickson, M.D., associate dean for Clinical Affairs and director of the Center for Patient and Professional Advocacy at Vanderbilt University Medical Center. "If health care organizations encourage patients and families to speak up, their observations and complaints, if recorded and fed back to organizational leadership, can serve as part of a surveillance system to identify behaviors by members of the health care team that create unnecessary risk."

## Root causes and contributing factors

There is a history of tolerance and indifference to intimidating and disruptive behaviors in health care.(10) Organizations that fail to address unprofessional behavior through formal systems are indirectly promoting it. (9,11) Intimidating and disruptive behavior stems from both individual and systemic factors.(4) The inherent stresses of dealing with high stakes, high emotion situations can contribute to occasional intimidating or disruptive behavior, particularly in the presence of factors such as fatigue. Individual care providers who exhibit characteristics such as self-centeredness, immaturity, or defensiveness can be more prone to unprofessional behavior.(8,11) They can lack interpersonal, coping or conflict management skills.

Systemic factors stem from the unique health care cultural environment, which is marked by pressures that include increased productivity demands, cost containment requirements, embedded hierarchies, and fear of or stress from litigation. These pressures can be further exacerbated by changes to or differences in the authority, autonomy, empowerment, and roles or values of professionals on the health care team, (5,7,16) as well as by the continual flux of daily changes in shifts, rotations, and interdepartmental support staff. This dynamic creates challenges for inter-professional communication and for the development of trust among team members.

Disruptive behaviors often go unreported, and therefore unaddressed, for a number of reasons. Fear of retaliation and the stigma associated with "blowing the whistle" on a colleague, as well as a general reluctance to confront an intimidator all contribute to underreporting of intimidating and/or disruptive behavior.(2,9,12,16) Additionally, staff within institutions often perceive that powerful, revenue-generating physicians are "let off the hook" for inappropriate behavior due to the perceived consequences of confronting them.(8,10,12,17) The American College of Physician Executives (ACPE) conducted a physician behavior survey and found that 38.9 percent of the respondents agreed that "physicians in my organization who generate high amounts of revenue are treated more leniently when it comes to behavior problems than those who bring in less revenue."(17)

## Existing Joint Commission requirements

Effective January 1, 2009 for all accreditation programs, The Joint Commission has a new Leadership standard (LD.03.01.01)* that addresses disruptive and inappropriate behaviors in two of its elements of performance:

EP 4: The hospital/organization has a code of conduct that defines acceptable and disruptive and inappropriate behaviors.

Case 2:19-cv-01023-KJM-DB   Document 1   Filed 06/05/19   Page 35 of 48

EP 5: Leaders create and implement a process for managing disruptive and inappropriate behaviors.

In addition, standards in the Medical Staff chapter have been organized to follow six core competencies (see the introduction to MS.4) to be addressed in the credentialing process, including interpersonal skills and professionalism.

## Other Joint Commission suggested actions

1. Educate all team members – both physicians and non-physician staff – on appropriate professional behavior defined by the organization's code of conduct. The code and education should emphasize respect. Include training in basic business etiquette (particularly phone skills) and people skills.(10, 18,19)

2. Hold all team members accountable for modeling desirable behaviors, and enforce the code consistently and equitably among all staff regardless of seniority or clinical discipline in a positive fashion through reinforcement as well as punishment.(2,4,9,10,11)

3. Develop and implement policies and procedures/processes appropriate for the organization that address:

   - "Zero tolerance" for intimidating and/or disruptive behaviors, especially the most egregious instances of disruptive behavior such as assault and other criminal acts. Incorporate the zero tolerance policy into medical staff bylaws and employment agreements as well as administrative policies.
   - Medical staff policies regarding intimidating and/or disruptive behaviors of physicians within a health care organization should be complementary and supportive of the policies that are present in the organization for non-physician staff.
   - Reducing fear of intimidation or retribution and protecting those who report or cooperate in the investigation of intimidating, disruptive and other unprofessional behavior.(10,18) Non-retaliation clauses should be included in all policy statements that address disruptive behaviors.
   - Responding to patients and/or their families who are involved in or witness intimidating and/or disruptive behaviors. The response should include hearing and empathizing with their concerns, thanking them for sharing those concerns, and apologizing.(11)
   - How and when to begin disciplinary actions (such as suspension, termination, loss of clinical privileges, reports to professional licensure bodies).

4. Develop an organizational process for addressing intimidating and disruptive behaviors (LD.3.10 EP 5) that solicits and integrates substantial input from an inter-professional team including representation of medical and nursing staff, administrators and other employees.(4,10,18)

5. Provide skills-based training and coaching for all leaders and managers in relationship-building and collaborative practice, including skills for giving feedback on unprofessional behavior, and conflict resolution.(4,7,10,11,17,20) Cultural assessment tools can also be used to measure whether or not attitudes change over time.

6. Develop and implement a system for assessing staff perceptions of the seriousness and extent of instances of unprofessional behaviors and the risk of harm to patients.(10,17,18)

7. Develop and implement a reporting/surveillance system (possibly anonymous) for detecting unprofessional behavior. Include ombuds services(20) and patient advocates,(2,11) both of which provide important feedback from patients and families who may experience intimidating or disruptive behavior from health professionals. Monitor system effectiveness through regular surveys, focus groups, peer and team member evaluations, or other methods.(10) Have multiple and specific strategies to learn whether intimidating or disruptive behaviors exist or recur, such as through direct inquiries at routine intervals with staff, supervisors, and peers.

8. Support surveillance with tiered, non-confrontational interventional strategies, starting with informal "cup of coffee" conversations directly addressing the problem and moving toward detailed action plans and progressive discipline, if patterns persist. (4,5,10,11) These interventions should initially be non-adversarial in nature, with the focus on building trust, placing accountability on and rehabilitating the offending individual, and protecting patient safety.(4,5) Make use of mediators and conflict coaches when professional dispute resolution skills are needed.(4,7,14)

9. Conduct all interventions within the context of an organizational commitment to the health and well-being of all staff, (11) with adequate resources to support individuals whose behavior is caused or influenced by physical or mental health pathologies.

10. Encourage inter-professional dialogues across a variety of forums as a proactive way of addressing ongoing conflicts, overcoming them, and moving forward through improved collaboration and communication.(1,2,4,10)

11. Document all attempts to address intimidating and disruptive behaviors.(18)

## References

1 Rosenstein, AH and O'Daniel, M: Disruptive behavior and clinical outcomes: Perceptions of nurses and physicians. *American Journal of Nursing*, 2005, 105,1,54-64

2 Institute for Safe Medication Practices: Survey on workplace intimidation. 2003. Available online: https://ismp.org/Survey/surveyresults/Survey0311.asp (accessed April 14, 2008)

3 Morrissey J: Encyclopedia of errors: Growing database of medication errors allows hospitals to compare their track records with facilities nationwide in a nonpunitive setting. *Modern Healthcare*, March 24, 2003, 33(12):40,42

4 Gerardi, D: Effective strategies for addressing "disruptive" behavior: Moving from avoidance to engagement. Medical Group

Case 2:15-cv-09003-KM-JB Document 1-1 Filed 08/05/19 Page 36 of 48

Management Association Webcast, 2007 and Gerardi, D: Creating Cultures of Engagement: Effective Strategies for Addressing Conflict and Disruptive Behavior: Arizona Hospital Association Annual Patient Safety Forum, 2008

5 Ransom, SB and Neff, KE, et al: Enhancing physician performance. American College of Physician Executives, Tampa, Fla., 2000, chapter 4, p.45-72

6 Rosenstein, A, et al: Disruptive physician behavior contributes to nursing shortage: Study links bad behavior by doctors to nurses leaving the profession. *Physician Executive*, November/December 2002, 28(6):8-11. Available online: http://findarticles.com/p/articles/mi_m0843/is_6_28/ai_94590407 (accessed April 14, 2008)

7 Gerardi, D: The Emerging Culture of Health Care: Improving End-of-Life Care through Collaboration and Conflict Engagement Among Health Care Professionals. *Ohio State Journal on Dispute Resolution*, 2007, 23(1):105-142

8 Weber, DO: Poll results: Doctors' disruptive behavior disturbs physician leaders. *Physician Executive*, September/October 2004, 30(5):6-14

9 Leape, LL and Fromson, JA: Problem doctors: Is there a system-level solution? *Annals of Internal Medicine*, 2006, 144:107-155

10 Porto, G and Lauve, R: Disruptive clinical behavior: A persistent threat to patient safety. *Patient Safety and Quality Healthcare*, July/August 2006. Available online: http://www.psqh.com/julaug06/disruptive.html (accessed April 14, 2008)

11 Hickson, GB: A complementary approach to promoting professionalism: Identifying, measuring, and addressing unprofessional behaviors. *Academic Medicine*, November 2007, 82(11):1040-1048

12 Rosenstein, AH: Nurse-physician relationships: Impact on nurse satisfaction and retention. *American Journal of Nursing*, 2002, 102(6):26-34

13 Hickson GB, et al: Patient complaints and malpractice risk. *Journal of the American Medical Association*, 2002, 287:2951-7

14 Hickson GB, et al: Patient complaints and malpractice risk in a regional healthcare center. *Southern Medical Journal*, August 2007, 100(8):791-6

15 Stelfox HT, Ghandi TK, Orav J, Gustafson ML: The relation of patient satisfaction with complaints against physicians, risk management episodes, and malpractice lawsuits. *American Journal of Medicine*, 2005, 118(10):1126-33

16 Gerardi, D: The culture of health care: How professional and organizational cultures impact conflict management. *Georgia Law Review*, 2005, 21(4):857-890

17 Keogh, T and Martin, W: Managing unmanageable physicians. *Physician Executive*, September/October 2004, 18-22

18 ECRI Institute: Disruptive practitioner behavior report, June 2006. Available for purchase online: http://www.ecri.org/Press/Pages/Free_Report_Behavior.aspx (accessed April 14, 2008)

19 Kahn, MW: Etiquette-based medicine. *New England Journal of Medicine*, May 8, 2008, 358; 19:1988-1989

20 Marshall, P and Robson, R: Preventing and managing conflict: Vital pieces in the patient safety puzzle. *Healthcare Quarterly*, October 2005, 8:39-44

\* The 2009 standards have been renumbered as part of the Standards Improvement Initiative. During development, this standard was number LD.3.10.

-Top-

**Please route this issue to appropriate staff within your organization. *Sentinel Event Alert* may only be reproduced in its entirety and credited to The Joint Commission.**

# EXHIBIT 2



**San Joaquin General Hospital/** P. O. Box 1020 • Stockton • CA 95201 • (209) 468-6000

October 1, 2016

Abbas Bahari, MD
9093 Sycamore Avenue, Apt 109
Montclair, California   91763

RE:  EMPLOYMENT AGREEMENT WITH SAN JOAQUIN GENERAL HOSPITAL

Dear Dr. Bahari:

Based on our discussions with you, we submit a revised offer for your review.  There have been increases in base salary, incentive pay and in the call structure and payment.  The current offer is summarized as follows (changes are in red text):

- <u>Base compensation (guaranteed) in the amount of $540,000 annually</u>, which is paid on a biweekly basis ($20,769.23).   This is an increase of $20,000 over our previous offer.

- <u>Board Certification.</u>   You will be paid an additional $20,000 per year ($769.23 biweekly) for board certification in neurosurgery once you receive it.  This is the same as previously offered.

- <u>Incentive Payment – Work at SJGH.</u>  Neurosurgeons will be paid 15% of their professional fee charges.  The incentive is paid monthly up to a maximum which is set based on your years of service (please refer to the attached Compensation Plan).  The maximum incentive for you will be $140,000 per fiscal year.  This is an increase of $30,000 over the previous offer.

- <u>Extra Call</u>.  We have modified the structure for call.  As part of your base salary guarantee, you are asked to take five days of call per month.  Any call you take beyond five days will be paid at the rate of $2,000 per day.  We have structured the Neurosurgery Service such that there will be three neurosurgeons taking call, leaving at least fifteen days of call each month that can be paid at the extra call rate.  If a colleague is on vacation, you may be asked to cover for their call, which will be paid as extra call if it is beyond your five days of scheduled call.  We will use locum tenens to help cover the service if unforeseen circumstances occur where there is an extended period where a member of your Division is not available.  The amount of extra call taken is up to you, in communication with your fellow neurosurgeons.  For example, taking just two days of extra call per month routinely will result in an additional $48,000 per year of extra call pay.  Taking five days of extra call each month routinely would add $120,000 per year.

Abbas Bahari, MD
October 1, 2016
Page Two

- <u>Total Compensation Estimates</u>.   Your total compensation, including base salary, board certification (once received), and incentive payment will be up to $680,000 for your first year and up to $700,000 after you receive your Board certification in neurosurgery.   With experience there will be additional increases in base compensation and incentive payment. (see attached compensation plan description). Our plans are to expand the locations in which neurosurgical services will be provided and we hope to contract with other hospitals/facilities to capture patients to build your neurosurgical practice.

- <u>Allied Health Professionals</u>.   SJGH is working to hire physician assistants and other allied health professionals to assist the neurosurgeons in their clinic and operative work.   They will work for the neurosurgeons to help admit, discharge and manage patients in the hospital and in the emergency department.   It is also possible for the allied health professionals to assist you in surgery, once trained and oriented.

- <u>Full malpractice coverage</u> for work you complete on behalf of SJGH.   This is valued on the marketplace at approximately $50,000 to $70,000 per year for vascular surgeons.   Should you leave employment with SJGH, the County will pay for tail coverage.

- <u>Health, dental and vision benefits for you</u> (valued at approximately $7,037 per year) plus Medicare, Social Security, and Unemployment benefits, totaling approximately $55,124 with pension.   Your paid time off is in addition to these totals.   Please note that, the County will pay for approximately 70% of the premium for dependent health care.

- <u>A Retirement (pension) plan</u> is available to you. This pension program provides you full retirement benefits based on your years of service with the County, your age at retirement and the average of your highest three years of earnings.   To be eligible, you must complete a minimum of five years of work at SJGH.

- <u>Twenty-nine days of annual leave</u> for the first year, growing to 30 days after one year. Increases are made incrementally based on years of service, <u>up to a maximum of 40 days</u> per year after eight years of employment.   Existing policy requires that time off be used during the July-to-June time period.   You are allowed to carry over unused time up to a maximum of fifteen days.   Your previous work experience will count in the determination of how much annual leave time you may have.

- <u>Five days of continuing medical education (CME)</u> leave to attend educational programs and workshops that will enhance your clinical expertise.   These days are in addition to your annual leave, and are to be used during the July-to-June fiscal year.   CME days cannot be carried over from year-to-year.

Abbas Bahari, MD
October 1, 2016
Page Three

- $1,250 available each fiscal year for educational reimbursement for <u>continuing medical education, professional license fees, and/or membership in professional associations</u>.  The Surgery Department has a Medical Education Fund available to pay for Departmental and individual educational activities.

- Participation in a <u>deferred compensation plan (457),</u> where you can, at your discretion, deposit up to $16,500 of your salary in pre-tax dollars.

- Participation, at your discretion, in the <u>County's Flex 125 Plan</u>, where you can pay for childcare or medical expenses with pre-tax dollars.

- Participation in a <u>life insurance program at your discretion</u>.  Coverage limits are tied to years of service.  After a minimum number of years are met, insurance is available in increments of $50,000 up to a maximum of $200,000 in coverage.  The premiums are set at group rates and paid by you.

- Participation in the <u>State Disability Program</u>.  Premiums are paid by you.

- <u>Reimbursement of moving expenses up to $10,000</u>.  You are responsible for making your own arrangements for moving.  The Hospital will reimburse you after submission of receipts to Administration.  Please be aware that the County requires a refund of your moving expenses should you leave employment in less than two years.

- <u>Signing Bonus</u>.  You are eligible to receive a $20,000 signing bonus.  This will be paid as a lump sum prior to start date.  The requirement for this bonus is that if you leave employment in less than four years (from initial hire date), you will be asked to refund the County this bonus.  Please sign the attached signing bonus agreement which indicates your agreement to the terms.

- <u>Time Off to Prepare and Take Board Certification Exam.</u>  You requested and will be granted four weeks of time off to take your oral board certification examination when it is scheduled. You are able to use your five days continuing medical education as part of this time off.

If the employment agreement is acceptable, please sign and return it to my attention as soon as possible.  You have current medical staff privileges.  We will also be sending to you under separate cover applications from third party payers which are needed in order for us to bill for your professional services.   If this employment agreement is acceptable to you, you will be contacted by our Human Resources Department for the County required drug testing.  Please feel free to contact me if you have questions about this process.

Abbas Bahari, MD
October 1, 2016
Page Four


     We are very much looking forward to the opportunity of working with you.  We feel you will be a great contribution to building the neurosurgical practice at SJGH.  I think you will find San Joaquin General Hospital to be a good place to meet your professional goals.  Please do not hesitate to give me or Ms. Elaine Hatch a call at (209) 468-6600 if you have any questions.


     Sincerely,

     *Sheela Kapre MD*

     Sheela Kapre, MD
     Chief Medical Officer


SK:dl
cc:    Nathaniel Matolo, MD, Interim Chair, Department of Surgery
      David Culberson, Chief Executive Officer
      Elaine L. Hatch, Deputy Director, Medical Staff Services

### SAN JOAQUIN COUNTY
### SAN JOAQUIN GENERAL HOSPITAL
### PHYSICIAN EMPLOYMENT CONTRACT

DATE:

PARTIES:        San Joaquin County
On behalf of San Joaquin General Hospital
Post Office Box 1020
Stockton, California  95201

EMPLOYEE:     **ABBAS BAHARI, MD**
**P. O. Box 1020**
**Stockton, California  95201**

AGREEMENT:    The County hires the Employee as a physician employee under Government Code Section 31000, and the employee agrees to such employment.

1. The Employee shall work as an attending physician under the direction of the Chair of the Department of Surgery, the Trauma Medical Director and the Chief Medical Officer of San Joaquin General Hospital (SJGH) in accordance with Exhibit A.

2. The term of this contract shall be from October 31, 2016 through June 30, 2017 and shall be self-renewing for successive fiscal years.

3. Effective October 31, 2016 the County shall pay the Employee $ 20,769.23 biweekly for clinical services.

4. The County shall pay the Employee an incentive in accordance with the Neurosurgery Incentive Program.

5. The Employee shall be a member of the SJGH's Medical staff.  Employee acknowledges that having hospital privileges is an express contractual condition of Employee's employment.  Employee further acknowledges that having hospital privileges is an express requirement permitting Employee to do the essential functions of the position.  If the Employee's membership on the medical staff terminates, this contract terminates concurrently therewith.  If the Secretary of Health and Human Services determines that the Employee is excluded from participation in Federal health care programs, this contract terminates as of the effective date of the Secretary's determination.  If at any time the Employee's hospital privileges are suspended, limited, or restricted in any manner, whether on a voluntary basis or an involuntary basis, this contract, at the sole discretion of the County, terminates as of the effective date of the final determination of any such action.  In the interim between the initial implementation and the final determination of any such action, Employee may be placed on an unpaid leave of absence, in the sole discretion of the County.

6. This contract is not subject to the County's Civil Service System.  The Employee is eligible for the following fringe benefits:  health, dental and vision coverage for the

Employee; purchase of health and dental coverage for Employee dependents; life insurance coverage for Employee; participation in the County's deferred compensation program; participation in the County's Flex 125 Plan (Section 125 of the Revenue Code) and participation in the San Joaquin County Employees' Retirement Association (SJCERA).

7. Employees with less than one (1) year of employment at SJGH shall receive 29 days of annual leave per fiscal year. Compensation and annual leave shall be prorated for working less than 231 days per fiscal year.

   Employees with more than one (1) year but less than two (2) years employment at SJGH shall receive 30 days of annual leave per fiscal year. Compensation and annual leave shall be prorated for working less than 230 days per fiscal year.

   Employees with two (2) years of employment at SJGH but less than six (6) years shall receive 33 days of annual leave per fiscal year. Compensation and annual leave shall be prorated for working less than 227 days per fiscal year.

   Employees with six (6) years of employment at SJGH but less than eight (8) years shall receive 35 days of annual leave per fiscal year. Compensation and annual leave shall be prorated for working less than 225 days per fiscal year.

   Employees with more than eight (8) years of employment at SJGH shall receive 40 days of annual leave per fiscal year. Compensation and annual leave shall be prorated for working less than 220 days per fiscal year.

   Employee will be paid for unused annual leave based on employee's base salary upon termination of this contract by either party.

8. The fees charged for professional services rendered by Employee on behalf of County shall be determined by the County.

9. All fees and other compensation paid or payable for health care or related services performed by Employee shall be remitted to the County.

10. The Employee shall perform professional services and other practitioner-related obligations in accordance with San Joaquin General Hospital policies or its contracts with third-party payors and/or contracts with other health care providers.

11. During the term of this agreement, the County shall provide professional medical malpractice liability insurance and employment practice liability insurance, without cost to Employee, under the same coverage as is provided to other healthcare providers employed by the County. Should you leave Hospital employment, the County shall provide tail coverage.

12. Either party may terminate this contract on ninety (90) days written notice personally delivered or mailed to the address first given above.

ATTEST:  MIMI DUZENSKI
Clerk of the Board of Supervisors
of the County of San Joaquin,
State of California

COUNTY OF SAN JOAQUIN, A
political subdivision of the State
of California


By: _____

          Deputy Clerk

By: _____

          MOISES ZAPIEN, Chair
          Board of Supervisors


APPROVAL:

EMPLOYEE:


By: _____

          DAVID CULBERSON
          Chief Executive Officer

By: _____

          ABBAS BAHARI, MD


APPROVED AS TO FORM:
J. MARK MYLES
County Counsel


By: _____

          QUENDRITH MACEDO
          Deputy County Counsel

**EXHIBIT A**
**DUTIES AND RESPONSIBILITIES**

**ABBAS BAHARI, M.D.**
**Neurosurgeon**
**San Joaquin General Hospital**

1.  Provide neurosurgical clinical care at San Joaquin General Hospital (SJGH) and at SJGH contracted hospitals/facilities according to Hospital, County and State policies and requirements.

2.  Provide Supervise and evaluate patient care that is provided in the inpatient floors, operating room, emergency department, and clinics; maintain a review of all patients admitted to the neurosurgical services.

3.  Participate in the call schedule for neurosurgical emergencies, in accordance with the requirements set forth by the Surgery Department Chair and the Chief of Neurosurgical services.

4.  Provide neurosurgical services in accordance with the Trauma Program at SJGH, and in accordance with County policies, and American College of Surgeon requirements for trauma centers.

5.  Supervise interns and residents in the General Surgery Residency Training Program at SJGH in accordance with the requirements set forth by the Surgery Residency Program Director and the Accreditation Council for Graduate Medical Education (ACGME); complete required evaluations on interns and residents assigned to the neurosurgical service..

6.  In concert with the Surgery Program Director evaluate the training of surgical residents who provide professional services within the surgical service.

7.  Supervise, manage and evaluate allied health professionals, including nurse practitioners, physician assistants and other staff assigned to the Department of Surgery and to the Neurosurgery Service.

8.  Provide and coordinate educational programs for the benefit of the professional staff at SJGH  in accordance with policies and guidelines established by the American Board of Surgery, American Medical Association, California Medical Association, The Joint Commission, and the Medical Staff of SJGH.

9.  Actively work with the Trauma Medical Director in maintaining SJGH's designation as a trauma center; actively participate in quality assurance activities and committees related to SJGH's trauma program; comply with required continuing medical education requirements, attendance at meetings, and training requirements.

10. Actively work with the Surgery Program Director in maintaining accreditation of the General Surgery Residency Training Program.

11.   Participate on SJGH medical staff committees, monthly department meetings and other committees or duties as assigned by the Chief Medical Officer and/or the President of the Medical Staff.

12.   Assist the Chief Medical Officer and administrative staff in the development of annual budgetary requests for equipment, supplies and personnel as required.

13.   Provide reports concerning the trauma program, the general surgery residency program or the Surgery Department activities as requested by the Department Chair, President of the Medical Staff, the Trauma Medical Director, the Chief Medical Officer and/or Chief Executive Officer.

14.   Provide timely and appropriate documentation on services provided to comply with requirements for medical care, and for billing for professional services provided;

15.   Participate, conduct and coordinate quality improvement studies and peer review activities; develop, implement, and evaluate standardized procedures, policies and protocols.  Submit quality improvement reports that meet The Joint Commission, federal and state requirements and SJGH trauma program requirements..

14.   Participate and implement medical staff activities and requirements, including submission of timely dictation, medical report documentation, and participation on medical staff committees.

15.   Perform other duties as directed by the Chair of Surgery, the Trauma Medical Director, the Chief Medical Officer or the Chief Executive Officer.

16.   Maintain medical staff membership in keeping with the medical staff bylaws, rules and regulations, including participation in appropriate medical staff and hospital committees.

17.   May be appointed to serve in an Administrative or Elected Chair capacity, for which additional compensation may apply according to the Physician Leadership Compensation Schedule.  Such appointment may be made solely at the discretion of the SJGH Chief Medical Officer and/or Chief Executive Officer, or elected as a Chair in accordance with the SJGH Medical Staff Bylaws.

Bahari  duties

**SAN JOAQUIN GENERAL HOSPITAL**
**NEUROSURGERY SERVICES**
**COMPENSATION AND INCENTIVE PLAN**
**FOR FULL-TIME ATTENDING STAFF**
**Effective October 1, 2016 revised 9-22-2016**

**I. Compensation for Full-time Neurosurgeons (full benefits plus pension retirement):**

| Tier | Experience | Base Salary | Board Certification | Maximum Incentive/FY | Total |
|---|---|---|---|---|---|
| Tier 1 | < 2 years experience | $500,000 | | $100,000 | $600,000 |
| Tier 2 | ≥2 years to < 6 years experience | $540,000 | $20,000 | $140,000 | $700,000 |
| Tier 3 | ≥6 years experience | $560,000 | $20,000 | $160,000 | $740,000 |

**II. Board Certification:**

$20,000 per year ($769.23 per pay period) is paid to the physician starting the first pay period following receipt of confirmation of Board certification. Payment for board certification is maintained as long as the physician maintains board certification, including recertification and maintenance of certification requirements. This confirmation must be verified with the Medical Staff Office of San Joaquin General Hospital (SJGH).

**III. Call Requirements:**

A. Neurosurgeons are expected to fulfill the duties outlined in their employment agreement which includes a share of call at SJGH with other neurosurgeons. As part of your base contract, you are expected to take at least five (5) days of call per month. The call will be organized by the Neurosurgery Division and approved by the Chief of Neurosurgery. An employee will be paid for extra call beyond the five days per month. Payment will be at the rate of $2,000 per 24 hour call after submission of the dates of extra call. The neurosurgery call will be shared equally with at least three neurosurgeons, where holidays and call will be balanced among equally among the members.

B. Trauma Services. Neurosurgeons are expected to comply with trauma policies and requirements set forth by SJGH, the San Joaquin Emergency Medical Service Agency, and the American College of Surgeons in regards to response times, consultation services, surgical services and quality review requirements (e.g., PIPS reviews) for the neurosurgical service.

**IV. Neurosurgery Performance Incentive Plan:**

A. Purpose:

The purpose of the Neurosurgical Incentive Plan is to encourage and reward productive physicians which benefits both the physician and the Hospital. Incentives earned under this program is in addition to the Physician's base salary and are paid once per month.

B. Eligibility:

Neurosurgeons who meet the following criteria are eligible for the surgery performance incentive program as described herein:

- Completion of a neurosurgery fellowship
- board prepared or board certified in Neurosurgery

C. Incentive Plan: (Applies only to work performed at SJGH or on behalf of SJGH)

1. Eligible physicians will be paid, on a monthly basis, 15% of the net charges for professional fees from inpatient consultation, emergency department consultation, and surgeries or procedures completed at SJGH. The maximum incentive payment cap that can be earned each fiscal year is described in the table in Section I above.

2. Professional services provided in neurosurgery clinic is excluded from the incentive plan.

3. Professional services provided in CDCR/prison clinic or CDCR inpatient services or in the operating room at SJGH are paid at the rate of 95% of Medicare rates for professional neurosurgical services. Payments from CDCR/prison services are included in the maximum incentive payment category described in Section I above.

4. If a physician is hired or leaves mid-fiscal year, the maximum earned will be pro-rated.

5. Incentive Payments may be withheld if it is determined that the physician has a significant amount of incomplete medical records or if the physician is not completing documentation for billing.


Approved:


By:_____          By: _____
    Sheela Kapre, MD                                     David Culberson
    Chief Medical Officer                                Chief Executive Officer



Neurosurgery Comp Plan October 1, 2016